UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
THE UNITED STATES OF AMERICA, ex rel.,
PAMELA BRUMFIELD, et al,

                                          **COMPLAINT**

               Plaintiff,

                                      **Docket No.:**

    -against-

NARCO FREEDOM and ALAN BRAND, an individual

               Defendants.
--------------------------------------------------------------------X

This is a civil fraud action brought by private persons known as *qui tam* Relators, or whistleblowers, on behalf of the United States of America pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. §§ 3729 et.*seq.*.

## INTRODUCTION

On behalf of the United States of America, Relators file this *qui tam* complaint against Defendants Narco Freedom ("NARCO") and Alan Brand, an individual, (collectively referred to herein as "Defendants") and alleges as follows:

1.    This is a civil action to recover damages and penalties on behalf of the United States of America arising from false claims and statements made and presented by the Defendants and/or its agents and employees in violation of the Federal False Claims Act ("FCA") 31 U.S.C. §§ 3729 et *seq.* The violations alleged herein involve false and fraudulent claims the Defendants have made or caused to be made since on or before 2005. It is estimated that this fraud has cost the Medicaid Program millions of dollars each year, and is ongoing.

2.      The FCA provides that any person who knowingly submits or causes to be submitted, a false or fraudulent claim, to the government for payment or approval, is liable for civil penalties for each such claim submitted or paid, plus up to three times the amount of the damages sustained by the government as well as other relief the court may deem appropriate.

3.      Liability attaches under the FCA when a defendant submits or causes another to submit a claim for payment from government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used to get a false or fraudulent claim for government funds paid or approved.

4.      The FCA permits any person having information regarding a false or fraudulent claim for payment from government funds to bring an action for himself as the Relator for the government and allow him to share in any recovery.

5.      It is a requirement under the FCA that the Complaint be filed under seal (without service on the Defendant) to enable the government to conduct its own investigation without the Defendants' knowledge and to allow the government an opportunity to intervene in the action.

6.      On May 8, 2012, Relators submitted a written disclosure statement to the federal government disclosing "substantially all material evidence and information" in their possession.

7.      Relators, Pamela Brumfield, Guy Flanders, Quiana Ware, Jovanna Delvalle, Keisha Weston and Rise Grady ("Relators") are the original source of the information in this qui tam action.

8.      Based on these provisions, Relators seek to recover damages and civil penalties arising from the Defendants' presentation of false and fraudulent records, claims, and statements

and certifications made to the United States of America, in connection with Defendants' practices and programs funded through the Medicaid program. Relators seeks to recover all available damages, civil penalties, and all other relief available for expenditures impacted by Defendants' fraud, including all expenditures by the United States and New York State.

9.    Relators bring this civil fraud action on behalf of United States of America against Defendants. This action concerns the deliberate fraudulent misrepresentations of patients' charts and excessive service for service billed Medicaid from on or about 2005-present.

10.   As a service provider Defendants participates in the Federal State and Medicaid Program.

11.   Defendants run outpatient substance abuse treatment centers, and also train counselors on how to become Credentialed Alcohol and Substance Abuse Counseling "CASAC."

12.   Defendants have over two dozen facilities in the New York area where they operate and conduct business. One facility is located at 194 Van Dyke Street, Brooklyn New York 11231 and is commonly referred to as "Red hook."

13.   Defendants' clients are provided different treatment for their issues with substance abuse. Services include but are not limited to counseling, methadone maintenance, physical examinations, drug counseling, health education, coping skills and individual and group counseling.

14.   The United States Medicaid program provides the primary source of funding to pay for Defendants' out-patient treatment center. Medicaid coverage extends to all services Defendants provide.

15.   Defendants' outpatient treatment center is privately owned and is regulated by the Office of Alcoholism and Substance Abuse Services "OASAS"; a New York State Agency created in part to regulate drug and alcohol treatment centers.

16.   By an through this Complaint made pursuant to the FCA and corresponding state stautes, Relators assert that by and through the actions and omissions of Defendants directors, supervisors, employees and contract workers: (1) patients' medical charts were routinely back dated and then signed by counselors, doctors, nurses and directors to appear is the work was completed in compliance with  14 NYCRR 822 *seq*.  (2) counselors were instructed and paid to fraudulently complete patient charts assigned to other counselors (3) numerous patient charts for which Defendants had billed Medicaid are missing records necessary to receive payment, such as psycho socials, treatment plans, progress notes and discharge summaries, making it impossible to verify services or to insure services were not excessively or inadequately provided, if at all provided;  (4) patients are knowingly given unjustified or excessive types of out-patient drug treatment services including dually enrolling them into programs which provide similar if not parallel services; (5) patients are knowingly approved for outpatient treatment programs which requires proof of addiction without prior drug testing; (6)  Defendants paid an individual who was neither a CASAC or CASAC Trainee to complete the charts of counselors who no longer worked at the facility for work already billed to make it appear as if the medical charts are in compliance with 14 NYCRR 822 *seq*.

17.   In November of 2011, Relators informed Defendants they would no longer follow Defendants directives in fraudulently documenting patients' chart to make records appear to be in compliance which were not.  Defendants then retaliated by terminating the

Relators, within less than 45 days, objecting to their unemployment benefits and have expressed an intention to file a complaint with the New York State Office of Professional Misconduct against the Relators in order to obfuscate responsibility.

## JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction to 31 U.S.C. §3732(a) and 28 U.S.C. §§ 1331 and 1345.  The underlying facts which support this Court's jurisdiction are set forth below in greater detail.

19.   Venue is proper in this District pursuant to 31 U.S.C. sec 3732(a) because at least one the Defendants' outpatient treatment programs are located within this district.

20.   Relators brings this action on behalf of themselves and the Government pursuant to 31 U.S.C. § 3730(b) (1).

## PARTIES

21.   Relator Pamela Brumfield is a resident of the state of New Jersey is a CASAC-Trainee. She worked for Defendants from or about 1999 -2011.

22.   Relator Guy Flanders is a resident of the State of New York and possesses his CASAC He worked for Defendants from on or around 2000-2011.

23.   Relator, Quiana Ware is a resident of the state of New York and is a CASAC Trainee. She worked for Defendants from on or around 2008- 2011.

24.   Relator, Jovanna Delvalle is a resident of the state of New York and is a CASAC Trainee. She worked for Defendants from on or about 2002-2011.

25.   Relator, Keisha Weston is a resident of the state of New York and holds a degree Associates Degree in office Technology. She currently holds the position of secretary and has worked for Defendants from 2004-present.

26.   Relator, Rise Grady is a resident of the state of New York and is a CASAC.  She worked for Defendants from on or about 2004-2011.

27.   Defendant NARCO is a New York corporation with its corporate office located at 477-481 Willis Avenue, Bronx, New York 10455.

28.   Defendant Alan Brand is the Chief Executive officer of NARCO and a resident of New York.

29.   Defendants have approximately 30 outpatient treatment centers throughout New York.

**GENERAL BACKGROUND**

30.   Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.), known as the Medicaid Act ("Act"), grants states the authority to provide medical and rehabilitative services to the poor elderly and disabled including outpatient services for alcohol and drug treatment programs.

31.   The Act computes the amount of federal assistance provided to the states who create and administer programs according to Federal guidelines.

32.   New York State's Medicaid program is the most expensive in the nation.  In fiscal year 2011, New York spent over $52 billion.  Approximately 75% is funded by the Federal Government and 25% is funded by the state.

33.   Under the FCA, any person who knowingly presents, or causes to represent a false or fraudulent claim for payment or approval, or knowingly makes or uses or causes to be used a false record or statement may be held liable to the Unites states Government for a civil penalty of not less than $5,000.00 and not more than $10,000.00, plus three times the amount of damages which the Government sustains because of the acts of the person. 31(USC §§ 3729-3733).

34. Under the New York Claims Act a civil penalty may be imposed on individuals and entities that file a false or fraudulent claim for payment from any state or local government, including healthcare programs such as Medicaid of not less than $6,000.00 not more than $12,000.00 per fraudulent claim filed. New York False Claims Act (State finance Law, §§187-194).

35. Under New York Social Services Law it is a violation to knowingly obtain or obtain for payment for items or services furnished under any social services program, including Medicaid, by use of false statement, deliberate concealment or other fraudulent scheme. The state may recover three times the amount incorrectly paid.  The Department of Health may impose a civil penalty of up to $2000.00 per violation.  If repeat violations occur within five years, a penalty of up to $7500.00 per violation, if they involve billing for services not rendered or providing excessive services. Social Law §145-c

36. According to Federal law, "outpatient treatment services" are services furnished to an individual who is not inpatient that are prescribed by a physician in accordance with a patient's treatment plan.

37. Title 18 of the NYCRR grants the New York State Department of health the power to limit, duration and scope of medical assistance authorized to be provided under the Social Services Law and this Title to medical care, services and supplies which are medically necessary and appropriate, consistent with quality care and generally accepted professional standards.

38. According to state law the purpose of outpatient programs for individuals with a diagnosis of chemical dependence is to provide medical evaluation clinical care

management, clinical services and rehabilitation service. (14 NYCRR Part 822 and 18 NYCRR Section 505.27).

39.　Medicaid service providers must prepare and maintain contemporaneous records demonstrating a provider's right to receive payment under the medical assistance program. (14 NYCRR Part 822 and 18 NYCRR Section 504. (a)).

40.　Providers further agree to keep, for a period of six years from the date of care, complete records of services or supplies furnished, and all other records necessary to disclose the nature and extent of the services furnished and all information regarding claims for payment submitted by, or on behalf of, the provider. (14 NYCRR Part 822 and 18 NYCRR Section 504. (a)).

41.　Providers must also furnish such records and information, upon request, to the department, the Secretary of the United States Department of Health and Human Services, the Deputy Attorney General for Medicaid Fraud Control and the New York State Department of Health. (14 NYCRR Part 822 and 18 NYCRR Section 504(a)).

42.　Providers are further limited to submitting payment for services rendered and which were medically necessary or otherwise authorized under the Social Services Law when furnished and which were provided to eligible persons.(14 NYCRR Part 822 and 18 NYCRR Section 504.(e)).

43.　Providers must disclose to an auditor all books and records or, in the discretion of the auditing agency, a sample thereof, relating to services furnished and payments received under the medical assistance program, including patient histories, case files and patient-specific data. (14 NYCRR Part 822 and 18 NYCRR Section 504.(g)).

44.   When  providers submit bills to Medicaid for payment, they are certifying that the information provided in relation to any claim for payment shall be true, accurate and complete; and Providers also agree to comply with the rules, regulations and official directives of the Department.(14 NYCRR Part 822 and 18 NYCRR Section 504.(h)&(i)).

45.   All medical bills for medical care, services and supplies shall contain a dated certification by the provide that the care, services and supplies itemized have in fact been furnished and such records must fully disclose the extent of the care and services provided to the individuals. (18 NYCRR Section 540 (7) (a)).

46.   An overpayment includes any amount not authorized to be paid under the medical assistance program, whether paid as a result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake. (18 NYCRR Section 518.1 (c )).

47.   This Complaint specifically involves allegations of fraudulent record keeping practices at Defendants' Outpatient drug treatment program.

48.   Here, as noted above, the New York State Department of Health ("DOH") is responsible for the administration of the State's Medicaid Program and within DOH; OASAS has responsibility of regulating service providers such as Defendants.

49.   In addition to understanding that their patient's records must be accurate and complete, service providers such as Defendants also agree to follow the timeline for admission procedures and post admission procedures mandated by Medicaid to qualify for compensation.

50.   Any individual who appears at the outpatient service seeking or having been referred for treatment or evaluation shall have an initial determination made and documented in a

written record by a qualified health professional, or other clinical staff under the supervision of a qualified health professional, which states in part the level of care needed by the patient which shall also be signed by the qualified health professional who has oversight over the clinical staff member.

51.    The level of care determination shall be made promptly and in no event not later than after two visits to the initial service. (14 NYCRR § 822.3(a) &(c)).

52.    If determined appropriate for the outpatient service, the individual shall be admitted. The decision to admit an individual shall be made by a staff member who is qualified health professional authorized by the policy of the governing authority to admit individuals.   The name of the qualified health professional that made the admission decision must be documented in the patient record. (14 NYCRR Section 822.4(i))

53.    Once a patient is admitted, providers must conduct a comprehensive evaluation, the comprehensive evaluation shall obtain that information necessary to determine whether a diagnosis of alcohol related or psychoactive substance related use disorder is indicated. Each comprehensive evaluation shall be coordinated by qualified health professional and be based, in part, on clinical interviews with the patient, and may also include interviews with significant others, if possible and appropriate. (14NYCRR Section 822.4 (a)(1)(2)(3))

54.    Within two weeks of admission, staff shall complete the patient's comprehensive evaluation /psycho social, which shall include a written report of findings and conclusions addressing, at a minimum, the patient's: chemical use, abuse and dependence history; history of previous attempts to abstain from chemicals and previous treatment experiences; comprehensive psychosocial history, including, but not limited to, the

following: legal involvements; HIV and AIDS, tuberculosis, hepatitis or other communicable disease risk assessment; relationships with, history of the use of chemicals by, and the impact of the use of chemicals on, significant others.

55.   The psycho social must also include an assessment of the patient's individual, social, vocational and educational strengths and weaknesses, including, but not limited to, the patient's literacy level, education and employment history, daily living skills and use of leisure time; the patient's medical and mental health history and current status; a specific diagnosis of alcohol related or psychoactive substance related disorder in accordance with the International Classification of Diseases, Ninth Revision or another Office-approved protocol; the patient's lethality (danger to himself or herself and to others) assessment the patients use of tobacco; and the patients gambling history. (14 NYCRR Section 822.4(4)(i-iii)&(a)-(i))

56.   The psycho social shall bear the names of the staff members who participated in evaluating the individual and must be signed by the qualified health professional responsible for the evaluation. (14 NYCRR Section 822.4(5)).

57.   Within 30 days of admission to an outpatient service, a written individual treatment plan for each patient based on the comprehensive evaluation shall be developed by the primary counselor or the primary therapist and reviews and approved by the multidisciplinary team. (14 NYCRR Section 822.6(f)).

58.   The treatment plan shall meet the identified needs of the patient in all functional areas, including but not limited to social, emotional, familial, educational, vocational, employment, legal, mental and physical health, as well as addiction. (14 NYCRR Section 822.6(g)).

59.   The treatment plan shall be developed in collaboration with the patient and reviewed and approved by a multi-disciplinary team; be based on the admitting evaluations specified above and any additional evaluation(s) determined to be required; specify the treatment goals for each problem identified and the objectives to be achieved while the patient is receiving services which shall be used to measure their progress while in treatment. (14 NYCRR Section 822.4(f)).

60.   The treatment plan must be signed by the responsible clinical staff member and be reviewed, approved, signed and dated by the medical director or other physician employed by the service within seven days of review and approval by the multidisciplinary team. (14 NYCRR Section 822.4 (10)).

61.   The responsible clinical staff member shall insure that the plan is included in the patient's record and that treatment is provided in accordance with the plan. (14 NYCRR Section 822.4(10) (m)).

62.   The treatment plan must be reviewed <u>at least every ninety calendar days</u> thereafter, by the responsible clinical staff member in consultation with the patient, and reviewed, signed and dated by a member of the multi-disciplinary team.  Every <u>fourth such ninety calendar day review</u> shall include an update of the psycho social. A summary of the patient's progress/progress notes, in each of the specified treatment plan goals shall be prepared and documented in the patient's record as part of the treatment plan review. (14 NYCRR Section 822.4 (10) (n)).

63.   Progress notes shall be written <u>at least every five visits or twice per month</u>, whichever comes first, unless the patient is scheduled less frequently than twice per month, in which case a progress note shall be written after each session.  If progress notes are written after

every session then no session notes are necessary but progress notes shall specify the duration of every visit. (14 NYCRR Section 822.4 (10) (s)).

64.   Progress notes shall be <u>written, signed and dated by the clinical staff providing the service;</u> provide a chronology of the patient's progress related to the goals established in the treatment plan; be sufficient to delineate the course and results of the treatment; and indicate the patient's participation in all significant other's treatment record the content and/or outcome of all visits. (14 NYCRR Section 822.4 (10) (s)).

65.   Discharge planning shall begin upon admission, be closely coordinated with the treatment plan, and be included in the patient record. (14 NYCRR Section 822.4 (10) (u)).

66.   The discharge plan shall be based on the patient's self-reported confidence in maintaining abstinence and shall provide an individualized relapse prevention plan. Also included in the discharge plan shall be an assessment of the home environment, vocational/educational/employment status, and relationships with significant others to establish the level of social resources available to the patient and the need for services to significant others. (14 NYCRR Section 822.4 (10) (u)).

67.   The discharge plan shall include but not be limited to the following: The patient's need for continued services, self-help and/or other needs which have been identified in the psycho social and over the course of treatment; the family's need for continued services; and specific referrals and initial appointments with identified providers of service, including options for post-discharge referral. (14 NYCRR Section 822.4 (10) (u)).

68.   A discharge plan shall be developed in collaboration with the patient and any significant other's the patient chooses to involve. (14 NYCRR Section  822.4 (10) (u))

69.   No patient shall be discharged without a discharge plan which must be reviewed by assigned staff and the supervisor prior to the discharge of the patient. This does not apply to patients who stop attending, refuse continuing care planning, or otherwise fail to cooperate. That portion of the discharge plan which includes the referrals for continuing care shall be given to the patient upon discharge. (14 NYCRR Section 822.4 (10) (x)).

70.   A summary, which includes the course and results of care and treatment must be prepared and included in each patient's record within 45 days of discharge. (14 NYCRR Section 822.4 (10) (y)).

71.   Providers must keep individual records for each patient who is admitted and provided services. These patient records must include in part, documentation of the comprehensive evaluation, including results of the patient's physical examination, the individual treatment plan, and all review and updates thereto; and notes on the patient's progress with such other agencies, results of any toxicology, breath testing, and any other testing performed; an discharge plan and summary, including the circumstances of the discharge. (14 NYCRR Section 822.5 (a) (1)-(a) (12)).

72.   There shall be reimbursement only for visits that meet the following requirements: each occasion of service must last and least 30 minutes; involve face to face contact with patient and treatment staff. (14 NYCRR Section 822.11 (1) & (3)).

73.   The content and/or outcome of all visits must be fully documented in the individual patient or significant other's treatment record. (14 NYCRR Section 822.11 (f)).

74.   The service must be provided by a qualified staff member who provided the treatment and the service must not provide services in excess of the clinical needs of the patients. (14 NYCRR Section 822.11 (2) (4)).

75.    Indications that services may be excessive include admitting individuals that present minimal or questionable need for chemical dependence services, provider applies static treatment schedules to its patients; retains patients in treatment despite patient attainment of treatment plan goals and/or sustained abstinence; continues treatment to patients despite their lack of progress and/or ongoing chemical abuse over time and fails to transfer/refer such individuals to the most appropriate level of care; develops non-individualized/generic treatment plans and/or generic treatment progress notes; fails to develop adequate recovery or discharge plans for patients. (14 NYCRR Section 822.11 (3) u)).

76.    The services must meet the standard established in  14 NYCRR Section 822 as set forth in paragraphs 39-74 of this Complaint, be documented in the patient's records and be reviewed by staff as required. 14 NYCRR Section 822.11 (j) (1)(2)(3)

## SPECIFIC ALLEGATIONS

77.    Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the government for filing a qui tam claim based on the investigation.

78.     Relators' knowledge comes from Defendants having worked for Defendants collectively from 1999 to until the present.

79.    Relators are the original source of the facts and information upon which the action is based.  This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation or in a Government Accounting Offices or Auditor General's report, hearing audit or investigation from the news media.

80. Relators have provided the United States Attorney's office for the Southern District of New York, statements and documents detailing known material evidence and information which is in accordance with this complaint in accordance with the provisions of 18 NYCRR Section 504 &517 and 14 NYCRR 822.

81. This complaint is supported by voluminous material evidence specifically demonstrating the persons who engaged in fraudulent conduct, when those persons engaged in the fraud and how it became a false claim for which Defendants were reimbursed by Medicaid.

82. Relators were primarily CASAC or CASAC trainees which Defendants employed as substance abuse counselors.

83. Relators' job description entailed counseling clients through their addiction in Defendants MMTP or Alternatives Program.

84. Relators were responsible for doing an initial intake, which in part determined a clients' eligibility to the program.

85. Relators were charged with drafting psycho socials to properly document a client history, devising treatment plans to chart a course of treatment, documenting the patient's file with progress notes to track the patient's progress after each session and  writing discharge summaries carefully explaining why the patient is no longer in need or eligible for the treatment provided.

86. From on or around 2005 though 2011, Defendants chronically billed for services, where a patient's medical charts were not maintained in the manner required by 18 NYCRR Section 504 &517 and 14 NYCRR 822.

87. In numerous cases under Defendants direction, chart documentation was prepared six months to years after Defendants billed for services and in some cases never.

88. At present, numerous patient files contain "back dated" or absolutely, no psycho socials, treatment plans, progress notes or discharge summaries, violating 18 NYCRR Section 504 &517 and 14 NYCRR 822 as well as the FCA and corresponding state law.

89. The examples which follow are a summary of the Defendants and their employees and agents' fraudulent conduct; however they do not encompass the entirety of Defendants wrongful conduct.

90. The complete records and information which can establish this fraud are peculiarly within the control and knowledge of the Defendants.  Defendants have exclusive control over the vast bulk of patients' records and billings which could fully establish the manner, type, and scope of the false claims alleged herein, and the person involved in the making of those false claims.

91. Relators do not have access or the ability to access without formal discovery all of the records which could fully establish the manner, type and scope of the fraud.  Relators believe that, with access to the records solely within the Defendants' control, a significant number of documentary support for a large number of additional examples of fraud and false billings Defendants will be uncovered.

92. As describe supra, Relators were employed by Defendants who had service provider contract and was regulated by OASAS.  Their primary job function was to provide counseling services in Defendants' out-patient drug treatment Center.

93. On May 7, 2009, Relators Brumfield, Ware and Weston collectively referred to as the "Court Street Relators" worked located at 217 Court Street, "Court Street."

94. On May 7, 2009, the building collapsed due to poor maintenance shortly before the Court Street Relators and other the workers were scheduled to be working in the building.

95.  Defendants then moved the "Court Street Relators" to the "Red Hook" location.

96.  Once at the new location Defendants instructed the "Court Street Relators" to newly admit all of their "Court Street" clients.

97.  Substantially more work is involved in newly admitting a patient than maintaining existing patients.

98.  By requiring Court Street Relators to newly admit their patients, Relators were now required to do a psycho social within 30 days (which is a 18-20 page document detailing the patients history), complete a treatment plan (a blue print for treatment incorporating client's short and long term goals within 30 days) and be approved by the multi disciplinary team as documented by their dated signatures as per 14 NYCRR Section 822.

99.  New clients also had to be reviewed every 90 days for a year, where as transfers were only reviewed every six months.

100.  On or about May 2009 Defendants also represented to Medicaid that all of the files had been destroyed as a result of the "Court Street" Building Collapse.

101.  However the Court Street files had not been destroyed as Defendants reported to Medicaid.

102.  As of December 2011, the last time most of the Relators were inside Defendant's facility, the original Court Street files were in Defendants' basement.

103.  Consequently in May of 2009, after the building collapse and repeatedly thereafter Defendants would instruct Relators to go into the original "Court Street" patient files, located in the basement, to supplement their files as needed.

104.  In treating the Court Street Relators' clients as new admissions, Defendants excessively billed Medicaid for over one thousand instances of unnecessary services in violation of 14 NYCRR Section 822.11 (3) u).

105.  In May of 2009, most of the Relators had a case load of about 50 patients.

106.  In conjunction with unnecessarily newly admitting all of their existing patients, Relators were also responsible for intake, which involved processing the same type of paperwork for actual newly admitted patients.

107.  By August of 2009 approximately 50%-70% of the Court Street Relators charts were about six months behind.  The Court Street Relators were missing progress notes, 90-day reviews, psycho socials, treatment plans and discharge summaries.

108.  In or around August 2009 Court Street Realators expressed their concerns to Defendants and were ignored.

109.  Defendants continued to bill Medicaid for all services even though they were aware the chart work was incomplete in violation of 14 NYCRR Section 822.

110.  Relator Brumfield also discovered around this time that several counselors, specifically James Eldell, Horace Field and Susan Morgan who had been at the Red Hook location prior to her, had files containing missing progress notes, 90-day reviews, psycho socials and treatment plans and discharge summaries for the past several years.

111.  From May 2009-August 2009, Yolanda Celestine's, one of the Defendants' directors, instructed the Court Street Relators to complete the "new admit"/ "Court Street" patient chart records without dating them.

112.   Ms. Celestine would then periodically retrieve only completed psycho socials and treatment plans and instruct Relators to date the chart as if the records had been completed on the day she retrieved the records.

113.   In or around August of 2009, after several staff members filed grievances against Ms. Celestine for improper conduct unrelated to this action, Defendants replaced Ms. Celestine with supervisor Belle Ingram as the Relators' new Director.

114.   In or around August of 2009 and after, Ms. Celestine's departure from Red Hook, approximately 50% of the Court Street patients had been fraudulently, newly admitted into Red Hook.

115.   In August of 2009, the new supervisor Ms. Ingram refused to sign off on the balance of the Relators' chart work to have the balance of the Court Street clients "newly admitted" into Red Hook.

116.   In August of 2009 Gerald Bethea, also one of Defendants' Directors scheduled a time with Court Street Relators where he would  sign off on the remaining "newly admitted patients"  and instructed  Relators to "put in any date" on the patients' charts records.

117.   The practice of backdating records became standard practice at the "Red Hook" location as the Relators fell further and further behind.

118.   On tens of thousands of occasions from 2005 through 2011, Relators were unable to complete psycho socials within the two week time frame in violation of (14 NYCRR Section 822.4(4) (i-iii) & ((a)-(i).

119.   In many cases numerous files appearing to be completed do not contain crucial psychosocial essential to properly assessing a client's need and qualification for treatment.

120.  On tens of thousands of occasion from 2005 -2011 individual treatment plans were not completed with 30 days or at any time during a patient's treatment history, in violation of 14 NYCRR Section 822.6(f).

121.  The lack of treatment plans completed within the appropriate time, if at all lead to many clients not being adequately treated, or lead to client's being  excessively treated in that Relators were unable to provide  clients with a customize road  to recovery in violation of 14 NYCRR Section 822.4(f).

122.  On tens of thousands of occasions from on or before 2005-2011 progress notes were not written every five visits or twice month, and when they were written since most of them were backdated, the duration of the visit was inaccurately specified and the visits when they took place were often less than 30 minutes in violation of 14 NYCRR Section 822.4(10) (s).

123.  On tens of thousands of occasions from on or before 2005- 2011 no discharge plans were created and therefore do not exist in the patients charts in violation of 14 NYCRR Section 822.4 10(u).

124.  As a result, Relators documented no rationale for why treatment ended nor recommended constructive next steps for the client.

125.  Defendants' basement contains 2-3 years of discharged client files, either incomplete or empty.

126.  On tens of thousands of occasions from on or before 2005 – 2011 Defendants continued to bill Medicaid for services even though they were fully aware that the majority of the Relators' charts were not properly documented in that documents were backdated or never created.

127.   Ms. Ingram, on several occasions would make a list of Relators charts and specify the items missing.   At no point did Defendants acknowledge the incomplete work to Medicaid or make billing adjustments.

128.   From August 2009 thru the end of 2011, Relators fell further behind as the directives from management constantly changed and the caseload and client demands continued. Ms. Ingram would repeatedly tell Relators to "take their time" and "pray on it."

129.   From August of 2009 through November of 2011, Relators would bring chart work to Ms. Ingram or Mr. Bethea, to sign, which Defendants had often billed Medicaid for months to years prior.

130.   From 2009 through November 2011 Mr. Bethea, Ms. Ingram, Ms. Celestine or Mr. Bethea would then also "back date the patients' record to the same date the counselor selected, before signing off on the charts so that the charts would appear to be in compliance with state law.

131.   Defendants had no way of knowing that the services billed to Medicaid had not actually taken place by looking through patient medical records nor did they seem to care.

132.   Relators kept portable hard drive of the counseling paperwork completed at Red Hook. The actual date the work was completed is reflected on the portable hard drive and not the vast majority of the patients' charts.

133.   Some of the Relators are in possession of their hard drive, but in some cases Defendants' are in possession of these hard drives.

134.   In or Around 2008 through 2009 Defendants hired three new counselors and Defendants instructed them to create counseling notes for files left incomplete by

counselors which had left Red Hook, for patients they were not treating and in many cases had no prior contact, in violation of 14 NYCRR Section 822.11(2)(4).

135.   In some cases the new counselors were asked to complete paper work that required dating items several years in the past.

136.   One of the counselor's Phil Salmeri refused to do the work and was fired.

137.   Another counselor Garret, simply did not do the work "back work" and when Defendants found out they terminated him.

138.   Defendants then hired Robert Alexander and Janet Vasquez to create the missing chart work, and paid them to do so, so that the patients chart would appear to be in compliance.

139.   Defendants also paid Relators Flanders, Grady, Ware and numerous other counselors at NARCO additional funds to complete years worth of charts, left incomplete by former counselors.  The practice was commonly referred to as "ghost writing" among Red Hook Staff. They created reports and forged signatures to make the records appear to be in compliance.  Defendants signed off on everything.

140.   Defendants also paid individuals no longer working at NARCO to complete charts by ghost writing.

141.   In 2006 Defendants instructed Relator Keisha Weston, who is a secretary and not a counselor to do "ghost writing" on 50 or so of counselor Vaughn Ryan's clients in violation of 14 NYCRR Section 822.

142.   Relator Weston possesses the flash drive documenting the work Defendants instructed her and paid her to complete.

143.   Defendant Brand authorized the work and paid Relator Weston 750.00/month for two months using a personal check.

144.   Relator Weston never met with clients, so all of the information was fraudulently created in order to make the charts appear to be in compliance. Mr. Bethea signed off on the paperwork, making it appear as if he was the counselor, but he also never met with the clients.

145.   From 2008 through 2011 Relator Weston would repeatedly type the faxes regarding payment made to counselors for doing chart work in the form of "back work and ghost writing."

146.   From 2009 through 2011 Defendants also instructed medical staff to back date medical records. Defendants would periodically instruct Relators to bring their completed charts down to the medical department where the medical staff specifically Dr. Jean Auguste would also engage in back dating the client's charts.

147.   From 2009-2011, Defendants also had clients dually enrolled in Defendants' Methadone Maintenance Treatment Program and Alternatives treatment program without completing the appropriate remark sheets and other documentation to justify the clients involvement in the program.

148.   On numerous occasions from 2009 through 2011, since there were no psycho socials completed, to understand the patients' history and or treatment plans to chart the course of the client's treatment, many clients received excessive services or inadequate as described in  (14 NYCRR Section 822.11 (3) u).

149.   In July of 2011, Medicaid changed their regulations and went from bundled billing to separate billing for each transaction.  Defendants instructed staff to focus on the new billing and to "forget" about the back work.

150. On Sept. 12, 2011, Defendants changed directives and held a meeting with Relators' Union and entered in a contract with the Union that Relators would complete all of their back work by December 8, 2011 and receive a one thousand dollar incentive.

151. Oct. 11, 2011, Ms. Ingram was removed as program director. Yolanda Celestine was brought back to Red Hook, as acting program director and Hana Kuc became assistant director.

152. On November 5, 2011, an anonymous complaint was sent to Mike Yurio at OASAS describing the "back work and other unethical practices, Defendants had repeatedly asked Relators to complete since 2006.

153. On November 16, 2011 representatives from OASAS came to investigate these complaints and they remained until November 18, 2011, interviewing most of the Counseling staff.

154. OASAS conducted a meeting solely with the counselors, including all of the Relators, where they informed staff that they should not be "back dating" or in any way falsifying medical records at the Defendants' instructions and that doing so would result in the loss of their license.

155. The only counselor that did not speak with OASAS was Marilyn Monroe.

156. OASAS informed the counselors that all statements would be kept confidential and that they would be conducting a thorough investigation into Defendants' practices. Representatives from OASAS then went into the file room and reviewed medical records before concluding their onsite investigation at the Red Hook location.

157. To date OASAS has taken no action against Defendants.

158.   In or around November 2011, Mr. Bethea stated to Relator Weston and a union representative, Diane Sanders "If they (Medicaid) found out that the work was never done or done years later, Medicaid would want all their money back".

159.   In or around November 2011 Mr. Bethea also stated at a meeting attended by Relator Weston, "If we get rid of all the counselors we can save the program".

160.   After OASAS conducted their investigation, Defendants decided to terminate all of the counselors, including all of the Relators with the exception of Marilyn Monroe.

161.   In an email dated on or about December 1, 2011, Defendant Brand instructed his director to terminate all 13 counselors, which included all of the Relators, with the exception of Marilyn Monroe.

162.   Defendants also instituted invasive new rules such as requiring Relators to leave their office door open at all times.

163.   Prior to the visit from OASAS Relators had received favorable evaluations from Defenadants

164.   Within 45 days of OASAS informing Defendants they would no longer back date or falsify records, Defendants terminated all of the counselors, including the Relators, with the exception of Marilyn Monroe.

165.   Defendants then continued to retaliate against Relators by contesting their unemployment and Defendants are now seeking to file a claim against Relators with the office of Professional Misconduct.

166.   Defendants were aware at all times that counselors were creating false Documents and placing these documents in patients' files.

167.   Defendants signed off on all of the fraudulently created documents.

168.   Defendants used the false medical records created by the counselors to fraudulently obtain payment from Medicaid.

169.   Relators assert that this practice was wide spread among all of Defendants' 30 facilities.

170.   In numerous staff meetings from 1999-2011 Relator Brumfield heard other Directors at Defendants' numerous other locations complain about how they were years behind in their chart work; as well as discuss how counselors were being paid to "ghost write" and "back date" charts to deal with the problem.

171.   At all times material hereto Defendants benefited from the payments of monthly claims submitted for reimbursement based on the fraudulently created medical records.    Had Medicaid known of the factual matters set out above, it would not have reimbursed Defendants for the services purportedly rendered reflected in Defendants fraudulent billing.    The manner in which Defendants instructed Plaintiffs, as well as other Counselors to create these medical records was contrary to law.  By making a claim for reimbursement, providers certify that the services provided in compliance with Medicaid regulations.

172.   Defendants herein made tens of thousands of such representations for each reimbursement bill that they submitted to Medicaid. A substantial number of these representations were false. Defendants had knowledge of and conspired with the other in the submission of false claims to Medicaid.

173.   Defendants their employees and agents, individually and in concert, knowingly submitted false claims to the United States

174.  The conduct of Defendants as set forth in this complaint constitutes a knowing presentment of false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C sec 3279 and 3730.

175.  By virtue of the false or fraudulent claims made or caused to be made by the defendants the United States has suffered damages and is therefore entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each false or fraudulent claim presented or caused to be presented by the Defendants.

176.  Froom 2005-2011 Relators estimate that Defendants wrongfully charged Medicaid fees for chart work that was either fraudulently created or never created in at least 50% of the occasions Defendants billed Medicaid.   The cost of this fraudulent conduct to the government over the course of more than six years is likely to exceed 20 million dollars.

### Count I: FEDERAL FALSE
### CLAIMS ACT (31 U.S.C. §3729 (a)(1))

177.  Relators realleges each of the allegations made in paragraphs 1-174 of this Complaint and further states the following: From on or before 2005 through 2011 Defendants, their employees and agents, individually and in concert, knowingly submitted false records and certifications to the United States Government to secure payment of Medicaid funds as set forth in the factual allegations portions of the Complaint.

178.  This is a claim for treble damages and civil penalties under the False Claims Ace, 31 U.S.C. §§ 3729 (a) (1)), as amended.

179.  The conduct of Defendants set forth in this Complaint constitutes knowingly making a false claim or acting with deliberate ignorance or with reckless disregard for the truth, made, used and caused to be made and use false claims and statements material to a false

or fraudulent claim paid or approved by the United States Government in violation of 31 U.S. C. §§ 3729 and 3730.

180.   By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and is therefore entitled to multiple damages under the false Claims Act, to be determined at trail, plus a civil penalty for each false or fraudulent claim presented or caused to be presented by the Defendants.

**Count II: FEDERAL FALSE
CLAIMS ACT (31 U.S.C. §3729 (a) (1) (b))**

181.   Relators realleges each of the allegations made in paragraphs 1-177 of this Complaint and further states the following: From on or before 2005 through 2011 Defendants, their employees and agents, individually and in concert, knowingly submitted false records and certifications to the United States Government to secure payment of Medicaid funds as set forth in the factual allegations portions of the Complaint.

182.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729 (a)(1)(b), as amended.

183.   The conduct of Defendants set forth in this Complaint constitutes knowingly making a false record or acting with deliberate ignorance or with reckless disregard for the truth, made, used and caused to be made and use false records and statements material to a false or fraudulent claim paid or approved by the United States Government in violation of 31 U.S. C. §§ 3729 and 3730.

184.   By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and is therefore entitled to multiple damages under the false Claims Act, to be determined at trail, plus a civil penalty for each false or fraudulent claim presented or caused to be presented by the Defendants.

## COUNT III (Conspiracy)

185.  Relator realleges each of the following allegations made in Paragraphs 1- 182 of this Complaint and further states as follows.

186.  On information and belief, Defendants conspired with each other and other yet unknown to commit acts set forth in this complaint.

187.  Said conspiracy constitutes a conspiracy to defraud the United States by seeking to and actually having a false or fraudulent claim allowed or paid in violation of 31 U.S.C. §§ 3729 and 3730.

## COUNT IV (Payment by Mistake)

188.  Relator realleges each of the allegations made in paragraphs 1-186 of this complaint and further states as follows:

189.  Plaintiff alleges a common law claim on behalf of the United States for payment by mistake.

190.  As a result of the conduct described in the factual allegations portion of This Complaint, at the time that the United States made the Medicare payments to defendants, The United States was unaware of the matters set forth above.

191.  The United States' erroneous beliefs were material to making the payment at issue.

192.  Had the United States' known of the conduct at issue, it would not have made the payments that it did to the Defendants. As a result of the acts set forth in this count, The United States has been damaged in an amount to be determined at trial and is entitled to recover these monies which were paid to the Defendants by mistake.

## COUNT V (Payment for unjust enrichment)

193. Relators reallege each of the following allegation made in Paragraphs 1-190 of this Complaint and further States as follows: Plaintiff alleges a common law claim on behalf of the United States for unjust enrichment.

194. This Court has jurisdiction pursuant to 28 U.S.C. § 1345.

195. As a result of the conduct described above, the defendants received certain Government funds to which they were not entitled.

196. As a result of the acts set forth in this count, the defendants were unjustly enriched at the expense of the United States under circumstances dictating that, in equity and good conscience, the money should be returned to the United States.

## COUNT VI (STATE FALSE CALIMS ACT)
### New York State finance Law, §§187-194)

197. Relators reallege each of the allegations made in paragraphs 1-194 of this Complaint and further states the following: From on or before 2005 through 2011 Defendants, their employees and agents, individually and in concert, knowingly submitted false records and certifications to the United States Government to secure payment of Medicaid funds as set forth in the factual allegations portions of the Complaint.

198. This is a claim for treble damages and civil penalties under the New York State Finance Law §§ 187-194, as amended.

199. The conduct of Defendants set forth in this Complaint constitutes knowingly making a false record or acting with deliberate ignorance or with reckless disregard for the truth, made, used and caused to be made and use false records and statements material to a false or fraudulent claim paid or approved by the New York State Finance Law §§ 187-194, as amended.

200.  By virtue of the false or fraudulent claims made or caused to be made by the Defendants, the United States has suffered damages and is therefore entitled to multiple damages under the false Claims Act, to be determined at trail, plus a civil penalty for each false or fraudulent claim presented or caused to be presented by the Defendants.

201.  WHEREFORE, Relators respectfully request that this honorable Court award it the statutory relief set forth in 31 U.S. C. §§ 3729 and 3730, and  New York State Finance Law §§ 187-194 for their attorney fees and costs and for such other relief as this Court believes to be just and appropriate. With respect to Counts I, II and VI judgment should be enters in favor of Plaintiffs against Defendants for treble damages sustained by it, for civil penalties of 5,500 to 11, 000 for each false claims presented or caused to be presented, plus interest, attorney's fees, costs and any and all relief that the Court deems just and proper, With respect to Counts IV and V, judgment should be entered in favor of Plaintiff and against Defendants for lawful damages and restitution of all funds by which Defendants were unjustly enriched, costs and any and all relief that the Court deems just and proper.

Dated: Great Neck, New York
      May 8, 2012

                         Respectfully submitted,

                         The Law Office of
                         BORRELLI & ASSOCIATES, P.L.L.C.
                         *Attorneys for Plaintiffs*
                         1010 Northern Blvd., Suite 328
                         Great Neck, New York 11021
                         Tel. (516) 248 - 5550
                         Fax. (516) 248 – 6027

By:                       _____

                         BENNITTA L. JOSEPH (BLJ 1064)