PREET BHARARA
United States Attorney for the
Southern District of New York
By:    KIRTI V. REDDY
         CRISTINE IRVIN PHILLIPS
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York  10007
Telephone Nos. (212) 637-2751/2696
Facsimile No. (212) 637-2702
kirti.reddy@usdoj.gov
cristine.phillips@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAMELA BRUMFIELD, GUY FLANDERS, QUIANA WARE, JOVANNA DELVALLE, KEISHA WESTON, and RISE GRADY, : : : : : : | **12 Civ. 3674 (JGK)** |
| Plaintiffs, : | |
| v. : | **FIRST AMENDED COMPLAINT-IN-INTERVENTION** |
| NARCO FREEDOM, INC. and ALAN BRAND, : | |
| Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| |
|---|
| UNITED STATES OF AMERICA, |
| : |
| Plaintiff-Intervenor, : |
| v. : |
| : |
| NARCO FREEDOM, INC., ALAN BRAND, GERALD BETHEA, JOINING HANDS MANAGEMENT INCORPORATED, BERNARD RORIE and DEVORAH HAIGLER, : : : : : |
| Defendants. : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, files this Amended Complaint-In-Intervention, alleging upon information and belief as follows:

## PRELIMINARY STATEMENT

1.      The United States of America brings this action seeking treble damages and penalties against Defendants Narco Freedom, Inc. ("Narco Freedom"), Alan Brand ("Brand"), Gerald Bethea ("Bethea"), Joining Hands Management Incorporated ("Joining Hands"), Bernard Rorie ("Rorie") and Devorah Haigler ("Haigler") (collectively, "Defendants") under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, based on Defendants' schemes to defraud the United States in connection with a federal health care program.[1]

2.      As set forth more fully below, the United States alleges in this action that Narco Freedom, a not-for-profit corporation that formerly operated numerous outpatient drug rehabilitation and methadone programs in the New York City area, engaged in three separate fraudulent schemes along with various other Defendants, each resulting in the submission of false and fraudulent claims for reimbursement from Medicaid.

3.      In the first scheme (the "Freedom House kickback scheme"), Narco Freedom, Brand and Bethea provided kickbacks in the form of short-term housing to individuals who lacked stable housing in order to induce those individuals to enroll in and attend one of Narco Freedom's outpatient chemical dependency programs.

---

[1] The United States has resolved all claims set forth herein against Narco Freedom, Joining Hands, and Haigler, through previously filed Consent Orders [Dkt. Nos. 119; 121]; this matter, therefore, remains ongoing only as to Defendants Brand, Bethea, and Rorie.

4.      Specifically, Narco Freedom operated a large number of short-term residences generically known as "three-quarter houses," which Narco Freedom named "Freedom Houses." Narco Freedom conditioned residency in its Freedom Houses upon enrollment in, and attendance at, an outpatient program operated by Narco Freedom.  Any Freedom House resident who failed or refused to adhere to this rule was removed from the Freedom House.  Narco Freedom then billed Medicaid for the outpatient treatments received by the residents of its Freedom Houses.

5.      In the second scheme (the "Joining Hands kickback scheme"), Narco Freedom, at Brand's direction, made monthly kickback payments to Joining Hands, an operator of three-quarter houses that was jointly owned by Rorie and Haigler, and in exchange, Rorie and Haigler referred the residents of Joining Hands to Narco Freedom outpatient programs and enforced attendance at those programs. Narco Freedom then billed Medicaid for the outpatient treatments received by the Joining Hands residents.

6.      To perpetrate the third scheme (the "medical record falsification scheme"), Bethea directed the falsification of medical records for patients in Narco Freedom outpatient programs.  Specifically, Bethea directed and paid Narco Freedom employees to create records, including treatment plans and progress notes, for patients they had not treated.  Bethea also directed Narco Freedom employees to backdate medical records for outpatient program services that allegedly had been rendered months or years earlier.  Narco Freedom billed Medicaid for services based upon these fraudulent records.

7.      These three schemes resulted in tens of millions of dollars in losses to the United States, based upon reimbursements for fraudulent Medicaid claims.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under the FCA pursuant to 28 U.S.C.

§§ 1331 and 1345, and 31 U.S.C. § 3730(a), as well as pursuant to the Court's general equitable

jurisdiction.

9.      Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a), as well as 28

U.S.C. §§ 1391(b) and (c), because a substantial part of the events or omissions giving rise to the

claims occurred in this District.

## THE PARTIES

10.      Plaintiff is the United States of America.  Through the United States Department

of Health and Human Services, Plaintiff provides federal funding for the Medicaid program in

New York State.  *See* 42 U.S.C. § 1396; 42 C.F.R. § 430.0.

11.      Defendant Narco Freedom is a not-for-profit corporation with a corporate office

formerly located at 477-481 Willis Avenue, Bronx, New York 10455.

12.      Defendant Brand was the sole member and Chief Executive Officer ("CEO") of

Narco Freedom for more than thirty years.

13.      Defendant Bethea was the CEO of Narco Freedom in 2014 and 2015.  Bethea also

was a director of operations from 2007 until 2014, and a program director from 2003 to 2007, at

Narco Freedom's outpatient clinical programs in Red Hook, Brooklyn.

14.      Defendant Joining Hands operated multiple three-quarter houses in Brooklyn

during the relevant time period.

15.      Defendants Haigler and Rorie are cousins who jointly owned and operated

Joining Hands.

## FACTS

### I.      Narco Freedom's Operations

16.      During the time period relevant to the allegations contained herein, Narco Freedom operated outpatient programs for the treatment of substance abuse at locations in the Bronx, Brooklyn, and Queens.

17.      Narco Freedom operated two types of outpatient programs:  programs that treated patients for opioid addictions through medically prescribed methadone ("methadone outpatient programs"), and programs offering individual and group counseling for individuals who wished to recover from all chemical dependency ("drug-free outpatient programs").

18.      A substantial majority of the individuals who received outpatient services at Narco Freedom were eligible for Medicaid.

19.      Between 2002 and 2014, Narco Freedom also operated as many as 21 short-term residences, known as Freedom Houses, in the Bronx, Manhattan, Brooklyn, and Queens.  These residences also were referred to generically as "three-quarter houses" or "sober houses."

20.      Freedom Houses were located in single-family or multi-family dwellings, in which residents were provided with a bunk bed in a shared bedroom and given access to bathroom and possibly kitchen facilities.  Freedom House capacities ranged from 30 to 200 residents.

21.      Narco Freedom made its Freedom Houses available for short-term residence only to individuals who agreed to attend Narco Freedom outpatient programs.  Any individual who stopped attending a Narco Freedom outpatient program or who "graduated" from the program was removed from the Freedom House.

22.     Freedom Houses provided no clinical services to residents and the staff at Freedom Houses had no clinical training.

23.     Freedom Houses were not regulated by any local, state or federal licensing entity or agency.

24.     Substantially all of the individuals who resided in Freedom Houses were Medicaid eligible and received public assistance, including a monthly housing allowance, through the New York City Human Resources Administration ("HRA").  Throughout the relevant time period, the amount of the HRA housing allowance was $215 per month.

25.     In order to reside in a Freedom House, an individual was required to assign his or her $215 monthly HRA housing allowance to Narco Freedom, but typically was asked for no additional payment.

26.     The conditions at the Freedom Houses were highly problematic.  Despite their purported purpose as "sober houses," many residents of the Freedom Houses were still using, and even selling, drugs.  Other common conditions included lack of heat, vermin infestations, fighting among residents, aggressive behavior by Freedom House staff toward residents (including physical aggression), and overcrowding.

27.     The Freedom Houses were understaffed, with as few as one staff member for every one hundred residents.

28.     Despite the conditions in the Freedom Houses, there was significant demand for short-term residence in those houses throughout the relevant time period, due to the extreme shortage of affordable housing in the New York City area.

**II.      The Freedom House Kickback Scheme**

      **A.      Creating and marketing the Freedom Houses**

      29.      In or around 2002, Narco Freedom began to open the Freedom Houses in order to drive more business to its outpatient programs.

      30.      Specifically, in or around 2002, Brand met with Jay Deutchman, a real estate developer, to discuss the concept of the Freedom Houses.  Deutchman agreed to purchase a building in which a three-quarter house operated by Narco Freedom would be located.

      31.      Brand disclosed to Deutchman at that time that he wanted to expand the scope of Narco Freedom to include operating three-quarter houses in order to generate increased enrollment in Narco Freedom's outpatient programs, and to increase the retention rate in those programs, thereby increasing profits to Narco Freedom based upon Medicaid payments for services attended by the Freedom House residents.

      32.      In order to drive business to its outpatient programs, Brand planned, as part of the Freedom House business model, to condition residence in a Freedom House upon enrollment in and attendance at one of Narco Freedom's outpatient programs.

      33.      Brand's rationale was that offering a bed in a Freedom House to an individual who otherwise had no stable housing would ensure that the individual would both enroll in and stay at Narco Freedom in order to maintain his or her place at the Freedom House.

      34.      Brand and Deutchman worked together to open numerous Freedom Houses.  In each instance, Deutchman purchased a building with the intention of leasing the building to Narco Freedom for use as a Freedom House.

      35.      Brand taught Deutchman a mathematical formula to utilize in considering whether to purchase a building for use as a Freedom House.  The formula calculated the total income that

the building would generate for Narco Freedom by multiplying the number of individuals that the building could house, times 3.5 Medicaid-reimbursed outpatient services per week at approximately $80 per service, plus the $215 HRA housing allowance.  Brand could rely on the Medicaid funds in calculating the income from a Freedom House because of the requirement that all residents attend a Narco Freedom outpatient program as a condition of residence.

36.     From the time that Narco Freedom began operating Freedom Houses, demand for residence in those houses, by individuals who lacked a stable place to live, was consistently high.

37.     This demand gave Brand and Narco Freedom the incentive to open a total of 21 Freedom Houses in New York City between 2002 and 2013.

38.     Most of the houses operated at or near full capacity a majority of the time.

39.     Narco Freedom also paid individuals to market its Freedom Houses.

40.     The marketing efforts for Narco Freedom, led by Donna DeCicco ("DeCicco"), were directed towards institutions that were likely to make referrals, such as detox facilities and inpatient treatment facilities, as well as the New York State Division of Parole.  This marketing often included an in-person presentation to the counselors or parole officers, which consisted of describing the Freedom Houses and Narco Freedom's outpatient programs.

41.     The goal of DeCicco and all individuals in the marketing department, as directed by Narco Freedom and Brand, was to keep the Freedom Houses "filled" with residents, who were then required to enroll in and attend outpatient programs at Narco Freedom.

42.     The marketing department communicated to the referring entities that enrollment at a Narco Freedom outpatient program was a condition of residence at a Freedom House.

43.     Because finding affordable housing was extremely difficult for many of the patients or parolees, the availability of the Freedom Houses drove referrals to Narco Freedom.

B.      **Operation of the Freedom Houses**

44.      Upon arrival at a Freedom House, residents were told by the Freedom House staff to report to the intake department at Narco Freedom within 72 hours in order to be placed in an outpatient program.

45.      If an individual did not attend all of the outpatient program services as directed by Narco Freedom, he or she risked being thrown out of the Freedom House.  This condition was generally known by all Freedom House residents.

46.      New Freedom House residents also were sent to HRA, to arrange for payment of their $215 monthly housing allowance directly to Narco Freedom.  Narco Freedom had a "rent" department that collected the HRA housing allowances.  Typically, Freedom House residents were not required to pay any rent beyond the HRA housing allowance.

47.      Freedom House staff members monitored the residents' attendance at the Narco Freedom outpatient programs and took action against residents who did not attend all services as directed by Narco Freedom.

48.      Narco Freedom's initial practice, at or around the time that the Freedom Houses first began to operate, was to require each resident to collect a slip of paper, referred to by the Freedom House staff as a "slip" or a "re-entry pass," from the outpatient program, and deliver it to the Freedom House staff upon returning to the Freedom House.  Residents who did not return with their "re-entry pass" faced consequences such as removal from the house or placement in an "isolation room."

49.      More recently, the use of re-entry passes was discontinued and the Freedom House staff members simply accessed patient records in Narco Freedom's computer system in

order to determine whether Freedom House residents were attending all outpatient program services as directed.

50.     Before he stepped down as C.E.O. of Narco Freedom, Brand regularly received a roster of the Freedom House residents and a weekly report showing the number of outpatient program services those residents attended.

51.     If Brand saw that residents were not attending Narco Freedom's outpatient programs, he directed individuals in charge of the Freedom Houses to enforce the attendance rule, including by evicting residents.

52.     If an individual who was already enrolled in another outpatient program came to reside in a Freedom House, he or she was directed to request a discharge from his or her existing program in order to enroll in a Narco Freedom outpatient program.  Narco Freedom required this discharge even if the person was happy and progressing in recovery at the other program.

53.     Counselors from other outpatient programs who contacted Narco Freedom to request that a Freedom House resident remain in their care were told that the resident needed to be discharged in order to enroll at a Narco Freedom outpatient program, or would be forced to leave the Freedom House.

54.     Because the Freedom House residents often were faced with an immediate and pressing need for housing, this policy typically resulted in a transfer from the other outpatient program to Narco Freedom, even if the resident did not wish to change outpatient programs.

55.     Once a Freedom House resident completed the maximum number of outpatient services for which Medicaid would pay at a 100% rate, he or she was deemed to have "graduated" from the Narco Freedom outpatient program and was discharged.  Once a Freedom

House resident was no longer enrolled in a Narco Freedom outpatient program, he or she typically was given 30 days to vacate the Freedom House.

### C.      Gerald Bethea's role in the scheme

56.      In his capacity as director of operations at the Narco Freedom outpatient clinic in Red Hook, Brooklyn, Bethea played a direct role in perpetrating the Freedom House kickback scheme.

57.      Specifically, Bethea kept track of the Freedom House residents who attended outpatient programs at the Red Hook location and the number of times each resident visited the program on a weekly basis.  Bethea reported individuals who he believed were not attending their outpatient program frequently enough to the Freedom House staff and directed that those individuals be required to attend.  Bethea was aware that the Freedom House staff could induce individuals to attend the outpatient programs by threatening to evict them from their house.

58.      Bethea took these actions to enforce outpatient program attendance by the Freedom House residents in order to increase the number of outpatient services at the Red Hook location that could be billed to Medicaid.

59.      In one instance, when individuals at a Freedom House were not appearing at the Red Hook location to enroll in a Narco Freedom outpatient program within 72 hours, as required by the Freedom House rules, Bethea complained to Brand that "the system is not be [*sic*] followed."

60.      Bethea also complained to DeCicco and the Narco Freedom marketing team that the Red Hook outpatient programs did not have enough patients.  In response, Narco Freedom opened another Freedom House in the area and those residents were all directed to attend an outpatient program at the Red Hook location.

11

61.     Later, after issuance of a criminal indictment against Brand in 2014, Brand chose Bethea to replace him as the acting CEO of Narco Freedom.

62.     Bethea subsequently was appointed by Narco Freedom's board of directors as the permanent CEO of Narco Freedom, and served in this capacity until March 2015.

63.     During his tenure as CEO of Narco Freedom, Bethea assumed the activities previously conducted by Brand with respect to weekly monitoring and enforcing outpatient program attendance by all of the Freedom House residents.

**D.     Profits generated by the Freedom Houses**

64.     Although the Freedom House residents made no financial contribution in exchange for residing in the Freedom Houses other than directing their $215 monthly housing allowance provided by HRA to Narco Freedom, operating the Freedom Houses was extremely profitable for Narco Freedom.  This was due to the funds paid by Medicaid for the outpatient treatments that the Freedom House residents were required to attend, which at various times totaled millions of dollars per month.

65.     For each of the Freedom Houses, the amount of the monthly lease payment, as well as payment of utilities, water, property taxes, repairs, and building citations, significantly exceeded the amount that Narco Freedom expected to receive in monthly housing allowance payments from HRA.

66.     For example, Freedom House 8, located at 6 St. Nicholas Terrace, New York, NY, had a capacity of 96 beds.  The rental lease payment for Freedom House 8 was $30,000 per month.  This did not include the cost of utilities and property taxes, or the labor and supplies that Narco Freedom incurred to operate the house.

67.     Assuming a 100% occupancy rate, Narco Freedom expected to receive no more than $20,640 per month in housing allowances from HRA for Freedom House 8, which was far less than what it paid to lease and operate the house.

68.     Despite the fact that the operating costs for the Freedom Houses exceeded the funds received from the residents' HRA housing allowances, that apparent financial deficit was more than compensated by the significant Medicaid funding Narco Freedom received for the outpatient program services attended by the Freedom House residents.

69.     Using the same example, Freedom House 8 housed up to 96 residents, all of whom were required to attend a Narco Freedom outpatient program.  Upon information and belief, Freedom House 8 operated at or near capacity a majority of the time.  Even if it operated at far less than full capacity, however, the Medicaid funds generated by the outpatient program services that the residents of Freedom House 8 were required to attend at Narco Freedom still generated tens of thousands of dollars in profits for Narco Freedom each month.

70.     Each of the Freedom Houses operated by Narco Freedom was similarly profitable, directly as a result of Narco Freedom's conditioning residence in the Freedom Houses upon attendance at a Narco Freedom outpatient program.

**E.     Criminal Indictment and Guilty Plea of Alan Brand**

71.     In October 2014, the Attorney General for the State of New York ("New York") commenced a criminal action against Brand and Narco Freedom, among others, captioned *People of the State of New York v. Alan Brand, Jason Brand, Gerald Bethea, Richard Gross, Narco Freedom, Inc. and DASO Development, Inc.*, Indictment No. 0783/2015, Supreme Court, Bronx County (the "New York Criminal Action").  In March 2015, New York filed a superseding indictment against Brand and Narco Freedom, among others, in the same matter.

72.     The superseding indictment, as relevant to the allegations asserted here, charged Brand and Narco Freedom with Enterprise Corruption, in violation of Penal Law § 460.21(1)(a), as well as several pattern acts of Grand Larceny in the First Degree in violation of Penal Law § 155.42.  The factual bases for these charges included the Freedom House Kickback Scheme.

73.     On April 1, 2016, Brand entered a guilty plea as to both the Enterprise Corruption and Grand Larceny charges (among others) in the New York Criminal Action.

74.     In his plea allocution, Brand admitted that, along with others, he "controlled, managed and operated OASAS regulated substance abuse treatment programs to obtain money and enrich [himself] by defrauding Medicaid . . . and by deceiving regulatory agencies."  Brand admitted that he accomplished this by, among other things, "submitting and causing to be submitted claims for reimbursement to Medicaid for substance abuse treatment services which were predicated on an illegal kickback; specifically, the defendant admits that during the time he was CEO of Narco Freedom, patients residing in Narco Freedom-operated Freedom Houses were required to attend Narco Freedom treatment programs as a condition of residency; the defendant admits those who resided in Freedom Houses were not free to choose which substance abuse program they wished to attend."

75.     Brand further admitted in his plea allocution that he "submit[ed] and caus[ed] to be submitted claims for reimbursement to Medicaid for substance abuse treatment services which were predicated on financial gain rather than therapeutic need and thus, in excess of patient need; specifically the defendant admits that during the time he was CEO of Narco Freedom, as well as during the time of his exclusion when he still continued to advise, consult and exert influence over the day-to-day affairs of Narco Freedom, patients that resided in Narco Freedom-operated 'Freedom Houses,' commonly known as three-quarter houses or sober houses, were required to

14

attend Narco Freedom treatment programs a minimum of three times per week, regardless of the patient's individualized need for treatment.  The value of said claims submitted to Medicaid exceeded One Million Dollars ($1,000,000)."

76.     The entirety of Brand's plea allocution in the New York Criminal Action is attached hereto as Exhibit A.

77.     On or about May 31, 2017, Narco Freedom, through the Chapter 7 Trustee of its bankruptcy estate, pled guilty to the same charges as Brand, and admitted to substantially the same facts contained in Brand's plea allocution, including those recited in Paragraphs 74 and 75, *supra*.

**III.     The Joining Hands Kickback Scheme**

78.     Narco Freedom and Brand also entered into a kickback arrangement with Joining Hands, which operated multiple three-quarter houses that were unaffiliated with Narco Freedom, and Rorie and Haigler, the joint owners of Joining Hands.

79.     Like the Freedom Houses, the Joining Hands three-quarter houses offered short-term residence in a communal setting to individuals who lacked a stable home.  Joining Hands also engaged in similar marketing efforts, directed toward individuals such as recent parolees and patients being discharged from inpatient substance abuse rehabilitation facilities.

80.     A condition of residence at a Joining Hands three-quarter house was attendance at a substance abuse outpatient program.

81.     Starting in 2008, Brand agreed that Narco Freedom would make monthly payments to Joining Hands in exchange for Rorie and Haigler referring the Joining Hands residents to Narco Freedom outpatient programs and requiring that the residents attend outpatient program services as directed by Narco Freedom.

82.     Between 2008 and 2011, Narco Freedom and Joining Hands entered into contracts styled as "lease agreements," whereby Narco Freedom agreed to pay Joining Hands as much as $15,000 per month, per house.   These agreements were signed by Brand and Rorie.

83.     Narco Freedom made the monthly payments via checks that Rorie picked up each month at the Narco Freedom office.  Brand personally directed that Narco Freedom make these payments.

84.     The payments made pursuant to these "lease agreements" were, in fact, payments for referrals.

85.     Payment records show that Narco Freedom initially characterized the payments as for "outreach," later changing that description to "rent."

86.     In exchange for these payments, Joining Hands referred its residents to Narco Freedom outpatient programs and required the residents to attend the outpatient program as a condition of their residence at the three-quarter house.

87.     Narco Freedom employees communicated with Joining Hands regarding the residents' attendance at the outpatient programs and Joining Hands also collected "slips" from residents as proof that they had attended an outpatient program service.

88.     Rorie and Haigler imposed "sanctions" for residents who missed outpatient program services.

89.     In addition to making monthly referral payments to Joining Hands, Narco Freedom, at Brand's direction, also made multiple payments to Rorie personally.

**IV.     Examples of False Claims Submitted to Medicaid**

90.     Narco Freedom submitted claims to Medicaid for outpatient program services that were the product of illegal kickbacks carried out through both the Freedom House Kickback Scheme and Joining Hands Kickback Scheme, and Medicaid paid those claims.

91.     As just a small sample of those claims, attached hereto as Exhibit B is a list of 40 Medicaid beneficiaries who resided in a Freedom House for a period of time between early 2007 and 2014 and simultaneously attended a Narco Freedom outpatient program, as well as amounts paid by Medicaid to Narco Freedom for those outpatient program services.

92.     As one example shown on Exhibit B, resident lists maintained by the Freedom Houses reflect that "FH Patient 21," with a redacted Medicaid ID number of *****52U, moved into Freedom House 9 on September 27, 2010.  According to Narco Freedom's patient records, four days later, on October 1, 2010, FH Patient 21 enrolled in an outpatient program at Narco Freedom's Red Hook facility.  FH Patient 21 remained in the Red Hook outpatient program until November 1, 2011; during that time, Narco Freedom billed and received payment from Medicaid in the amount of $20,125, for services purportedly rendered to FH Patient 21.

93.     As described *supra*, Narco Freedom compelled enrollment in and attendance at one of its outpatient programs by all residents of Freedom House 9, by conditioning their housing upon that enrollment and attendance.  As such, all claims submitted to Medicaid by Narco Freedom for services rendered to the residents of Freedom House 9, including FH Patient 21, were false and fraudulent because they were the product of the illegal kickback arrangement.

94.     Similarly, attached hereto as Exhibit C is a list of 10 Medicaid beneficiaries who resided in one of the three-quarter houses operated by Joining Hands for various periods of time

between 2009 and 2011, and simultaneously attended a Narco Freedom outpatient program, as well as amounts paid by Medicaid to Narco Freedom for those outpatient program services.

95.     As one example shown on Exhibit C, records maintained by Joining Hands reflect that JH Patient 10, with a redacted Medicaid number of *****10M, moved into a three-quarter house operated by Joining Hands at 38 Covert Street in Brooklyn on September 23, 2010. According to Narco Freedom's patient records, five days later, on September 28, 2010, JH Patient 10 enrolled in an outpatient program at Narco Freedom's Red Hook facility.  JH Patient 10 remained in the Red Hook outpatient program until May 4, 2011; during that time, Narco Freedom billed and received payment from Medicaid in the amount of $10,619, for services purportedly rendered to JH Patient 10.

96.     As described *supra*, Narco Freedom made monthly payments to Joining Hands in exchange for Joining Hands, through its owners Haigler and Rorie, referring the residents of their three-quarter houses to Narco Freedom for outpatient program services, and enforcing attendance at those programs.  All claims made to Medicaid by Narco Freedom for services rendered to the residents of Joining Hands three-quarter houses that arose out of this illegal kickback arrangement were thus *per se* false and fraudulent.

97.     The claims set forth in Exhibits B and C and described herein are just a small sample of the many hundreds of thousands of false and fraudulent claims submitted to Medicaid by Narco Freedom that were the products of illegal kickbacks provided through the Freedom House Kickback Scheme and Joining Hands Kickback Scheme.

**V.     The Medical Record Falsification Scheme**

98.     Narco Freedom and Bethea also engaged in the systemic falsification of medical records between 2008 and 2011 in the outpatient clinical programs in Red Hook, Brooklyn.

18

99.     Narco Freedom counselors at the Red Hook location routinely failed to complete medical records documenting the services provided to patients in the outpatient programs, as required by the Medicaid regulations.  These records included treatment plans, records of individual counseling sessions, and discharge summaries, among others.

100.    Instead of enforcing the recordkeeping requirements or taking appropriate corrective actions, however, Narco Freedom, at the direction of Bethea, paid other counselors, who had not treated the relevant patients, to falsify the records.  This practice was referred to at Narco Freedom as "ghostwriting."

101.    Specifically, correspondence and payment records show that Bethea directed and paid Narco Freedom counselors to perform "corrective action and maintenance" on the medical records of patients treated by other counselors.

102.    Bethea also directed and paid an individual employed at Narco Freedom as a secretary, who had no medical training, to falsify patient records.

103.    Additionally, Bethea instructed counselors who fell behind in their paperwork to backdate documents in their patient files, making it seem as though the documents had been prepared months or even years earlier.

104.    Specifically, internal emails from 2011 reflect that Narco Freedom identified more than 500 medical records as either missing or deficient.  Despite this knowledge, Narco Freedom never self-disclosed these deficiencies to any regulatory authority or returned any of the Medicaid funds that it received based upon the deficient records.  Instead, Narco Freedom instructed counselors to backdate or falsify records in order to conceal these deficiencies from the regulators.

105.    Substantially all of Narco Freedom's patients enrolled in the clinical programs at the Red Hook location were eligible for Medicaid, and Narco Freedom billed and received payment from Medicaid for services rendered to the patients whose medical records Narco Freedom knowingly falsified.

## FIRST CLAIM
### (as against Narco Freedom, Brand and Bethea)

### Violation of the False Claims Act:  Presenting False Claims for Payment
### (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))

106.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

107.    The Government seeks relief against Narco Freedom, Brand and Bethea under Section 3729(a)(1)(A) of the False Claims Act.

108.    As a result of offering kickbacks in the form of below-cost housing to induce residents to attend outpatient programs at Narco Freedom, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), Narco Freedom, Brand and Bethea knowingly caused false claims to be presented for reimbursement by Medicaid.

109.    Accordingly, Narco Freedom, Brand and Bethea knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

110.    By reason of these false or fraudulent claims that Narco Freedom, Brand and Bethea caused to be presented to Medicaid, the United States has paid millions of dollars in Medicaid reimbursements to Narco Freedom, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## <u>SECOND CLAIM</u>
**(as against Narco Freedom, Brand and Bethea)**

**Violation of the False Claims Act:  Use of False Statements**
**(31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))**

111.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

112.    The Government seeks relief against Narco Freedom, Brand and Bethea under Section 3729(a)(1)(B) of the False Claims Act.

113.    As a result of offering kickbacks in the form of below-cost housing to induce residents to attend outpatient programs at Narco Freedom, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), Narco Freedom, Brand and Bethea knowingly caused to be made false records or statements that were material to getting false or fraudulent claims paid by Medicaid.

114.    Specifically, Narco Freedom knowingly certified and/or represented that the reimbursements it sought for its outpatient program services were in full compliance with applicable federal and state laws prohibiting violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

115.    By reason of these false or fraudulent records or statements that Narco Freedom, Brand and Bethea caused, the United States has paid millions of dollars in Medicaid reimbursements to Narco Freedom, and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## THIRD CLAIM
**(as against Narco Freedom, Brand, Joining Hands, Rorie and Haigler)**

**Violation of the False Claims Act:  Presenting False Claims for Payment
(31 .S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

116.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

117.    The Government seeks relief against Narco Freedom, Brand, Joining Hands, Rorie and Haigler under Section 3729(a)(1)(A) of the False Claims Act.

118.    As a result of offering and accepting kickbacks in the form of cash payments in exchange for referring Joining Hands three-quarter house residents to attend outpatient programs at Narco Freedom, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), Narco Freedom, Brand, Joining Hands, Rorie and Haigler knowingly caused false claims to be presented for reimbursement by Medicaid.

119.    Accordingly, Narco Freedom, Brand, Joining Hands, Rorie and Haigler knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

120.    By reason of these false or fraudulent claims that defendants Narco Freedom, Brand, Joining Hands, Rorie and Haigler knowingly caused to be presented to Medicaid, the United States has paid millions of dollars in Medicaid reimbursements, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## FOURTH CLAIM
### (as against Narco Freedom, Brand, Joining Hands, Rorie and Haigler)

### Violation of the False Claims Act:  Use of False Statements
### (31 .S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))

121.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

122.    The Government seeks relief against Narco Freedom, Brand, Joining Hands, Rorie and Haigler under Section 3729(a)(1)(B) of the False Claims Act.

123.    As a result of offering and accepting kickbacks in the form of cash payments in exchange for referring Joining Hands three-quarter house residents to attend outpatient programs at Narco Freedom, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), Narco Freedom, Brand, Joining Hands, Rorie and Haigler knowingly caused to be made false records or statements that were material to getting false or fraudulent claims paid by Medicaid.

124.    Specifically, Narco Freedom knowingly certified and/or represented that the reimbursements it sought for its outpatient program services were in full compliance with applicable federal and state laws prohibiting violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

125.    By reason of these false or fraudulent records or statements that Narco Freedom, Brand, Joining Hands, Rorie and Haigler caused, the United States has paid millions of dollars in Medicaid reimbursements to Narco Freedom, and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## FIFTH CLAIM
### (as against Narco Freedom and Bethea)

**Violation of the False Claims Act:  Presenting False Claims for Payment
(31 .S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

126.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

127.     The Government seeks relief against Narco Freedom and Bethea under Section 3729(a)(1)(A) of the False Claims Act.

128.     By directing the falsification of medical records, Narco Freedom and Bethea knowingly caused false claims to be presented for reimbursement by Medicaid.

129.     Accordingly, Narco Freedom and Bethea knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

130.     By reason of these false or fraudulent claims that Narco Freedom and Bethea caused to be presented to Medicaid, the United States has paid millions of dollars in Medicaid reimbursements to Narco Freedom, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## SIXTH CLAIM
### (as against Narco Freedom and Bethea)

**Violation of the False Claims Act:  Use of False Statements
(31 .S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))**

131.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

132.    By directing the falsification of medical records, Narco Freedom and Bethea

knowingly caused to be made false records or statements that were material to getting false or

fraudulent claims paid by Medicaid.

133.    Specifically, Narco Freedom knowingly certified and/or represented that the

reimbursements it sought for its outpatient program services were in full compliance with

applicable federal and state laws prohibiting fraudulent and false reporting.

134.    By reason of these false or fraudulent records or statements that Narco Freedom

and Bethea caused, the United States has paid millions of dollars in Medicaid reimbursements to

Narco Freedom, and is entitled to recover treble damages plus a civil monetary penalty for each

false record or statement.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands judgment against defendants as follows:

A.      Treble the United States' damages, in an amount to be established at trial,

plus an $11,000 penalty for each false claim submitted in violation of the

False Claims Act;

B.      Award of costs pursuant to 31 U.S.C. § 3792(a)(3); and

C.      Such further relief as is proper.

Dated:  New York, New York
        November 10, 2017

                                PREET BHARARA
                                United States Attorney
                                Southern District of New York
                                Attorney for the United States of America


                        By:     s/Cristine Irvin Phillips
                                CRISTINE IRVIN PHILLIPS
                                KIRTI VAIDYA REDDY
                                Assistant United States Attorneys
                                86 Chambers Street, 3rd Fl.
                                New York, New York 10007
                                Tel. (212) 637-2696/2751
                                Fax (212) 637-2786
                                cristine.phillips@usdoj.gov
                                kirti.reddy@usdoj.gov